ing was made by the Indiana Circuit Court a so-called secret agreement between Shaw, Silkey and Smith was not before the Court.

It is therefore certain that plaintiff has not made out a case for breach of contract against these defendants and that the claim for damages and an accounting must fail.

BIONIC AUTO PARTS AND SALES, INC., et al., Plaintiffs,

v.

Tyrone C. FAHNER, Attorney General of Illinois, et al., Defendants.

No. 80C3696.

United States District Court, N. D. Illinois, E. D.

July 6, 1981.

Mark Solock, Sherman Magidson, Chicago, Ill., for plaintiffs.

Tom Morrissey, Asst. Corp. Counsel, Scott A. Mayer, Asst. States Atty., William Dicks, Asst. Atty. Gen., Chicago, Ill., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

SHADUR, District Judge.

By their Second Amended Complaint and accompanying emergency motion, Bionic Auto Parts and Sales, Inc. ("Bionic") and its several co-plaintiffs have moved for a preliminary injunction enjoining the defendants from:

(1) enforcing various provisions of Ill. Rev.Stat. ch. 95½, the Illinois Vehicle Code (the "Code"), and Rule 5–401A promulgated under the Code;

(2) entering plaintiffs' business premises without warrant and making seizures of plaintiffs' merchandise or business records; and

(3) entering plaintiffs' business premises without warrant and labeling the plaintiffs' merchandise.

This Court has conducted an evidentiary hearing in accordance with Fed.R.Civ.P. 65(a) on plaintiffs' motion. In accordance with Fed.R.Civ.P. 52(a) the Court makes the following findings of fact and states the following conclusions of law:

### Findings of Fact

1. This action is brought for declaratory and injunctive relief under 42 U.S.C. § 1983 and the Fourth, Fifth and Fourteenth Amendments to the Constitution. This Court has jurisdiction of the action.

2. Plaintiffs are corporations and individuals engaged or formerly engaged in the business of acquiring, wrecking, recycling, rebuilding and selling automotive parts. Plaintiffs are licensed by the State of Illinois for that purpose under Code § 5–301.

3. Defendants are the Illinois Attorney General, the Illinois Secretary of State (who is also its Motor Vehicle Administrator), the Cook County State's Attorney and the Chicago Superintendent of Police. Collectively defendants comprise the persons responsible for enforcing the statute and regulations at issue in this action.

4. Code § 5–401 prescribes certain records and information that must be maintained by licensees such as plaintiffs. It also empowers the Illinois Secretary of State to prescribe the forms of records to be maintained by licensees. Approximately August 8, 1978 then Secretary of State Alan Dixon promulgated such a rule ("Rule 5–401A"), which was thereafter held valid by the Illinois Supreme Court in *Northern Illinois Automobile Wreckers and Rebuilders Ass'n v. Dixon*, 75 Ill.2d 53, 25 Ill.Dec. 664, 387 N.E.2d 320 (1979). All the plain-

tiffs other than Bionic were members of the plaintiff trade association in that case.

5. At the time of the *Northern Illinois Automobile Wreckers* decision Code § 5–401 provided in part:

Every record required to be maintained under this Section shall be opened to inspection by the Secretary of State or his authorized representative or any peace officer for inspection at any reasonable time during the night or day.

After the Illinois Supreme Court decision the same provision (now Code § 5–401(e)) was amended to add the following sentence:

Such inspection may include examination of the premises of the licensee's established place of business for the purpose of determining the accuracy of required records.

Both such provisions permit warrantless inspections, the first relating to a licensee's records and the second relating to the licensee's premises.

6. Since enactment of the amendment referred to in Finding 5 plaintiffs have been subjected to administrative inspections and searches of their premises without notice, without consent and without the prior obtaining of warrants for such searches. On occasions such searches have been made by enforcement officers without having previously asked for or obtained any inspection of the records required to be maintained under the Code, and without having sought or engaged in any prior checking of such records. Accordingly such searches have not constituted "examination of the premises ... for the purpose of determining the accuracy of required records." On one occasion enforcement officers searching the premises of plaintiff Thomas Covello under such circumstances took two full days in "inventorying" Covello's property and placed indelible identification markings on a great many of the automotive parts maintained by said plaintiff in the regular course of his business, even though there was no authority, and even though the officers knew that there was no authority, for such conduct either in the Code or in Rule

5–401A. On another occasion enforcement officers searched the Covello premises looking for a wholly unrelated criminal offender, without a search warrant and lacking any basis for proceeding without one. At the hearing in this case enforcement officers testified that they had conducted all such searches with the consent of plaintiffs; but such consent had not been given in fact or, in other instances, such consent had been given solely under compulsion of the Code.

7. As a result of the adoption and enforcement (both authorized and unauthorized by the statute and the Rule) of Code § 5–401(e) and Rule 5–401A:

(a) Plaintiff Covello has been unable to remain in business and has been forced to close his three licensed establishments.

(b) Plaintiff Bionic has suffered a business decline and has had to add several employees for the sole purpose of maintaining the records required by Rule 5–401A.

### Conclusions of Law

Until June 17, 1981 the regulatory scheme of Code § 5–401, including its provisions for warrantless searches of the premises of licensees, might readily have been viewed as violative of the licensees' Fourth Amendment rights. In *Camara v. Municipal Court*, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967) the Supreme Court had overruled its eight-year-old decision in *Frank v. Maryland*, 359 U.S. 360, 79 S.Ct. 804, 3 L.Ed.2d 877 (1959) and held that administrative inspections are "searches" within the meaning of the Fourth Amendment. Accordingly warrantless administrative inspections of private property (including business property) without consent are, in Fourth Amendment terms, "unreasonable searches" and thus unconstitutional "except in certain carefully defined classes of cases." *Camara*, 387 U.S. at 528, 87 S.Ct. at 1730.

Only two statutory provisions at all comparable to those in the present case had since been upheld by the Supreme Court, and each involved an industry that was not only "pervasively regulated" but had a "long tradition of close government supervision"—a concept that, though never expressed in precisely these terms, is akin to defining a narrow group of businesses that exist almost at the sufferance of government and can therefore be subjected to restrictions not otherwise permissible. *Colonnade Catering Corp. v. United States*, 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970) (alcoholic beverage industry); *United States v. Biswell*, 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972) (firearms and ammunition business). That reading of limited exceptions to the *Camara* rule seemed to be reinforced by *Marshall v. Barlows, Inc.*, 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978), where warrantless administrative searches authorized under OSHA were held unconstitutional.

*Marshall v. Barlows* stated that warrants for administrative inspections are mandatory "unless some recognized exception to the warrant requirement applies...." *Id.* at 313, 98 S.Ct. at 1820. It explained the Colonnade and Biswell decisions as "exceptions" and "responses to relatively unique circumstances" (*id.*):

Certain industries have such a history of government oversight that no reasonable expectation of privacy, see *Katz v. United States*, 389 U.S. 347, 351–352, 88 S.Ct. 507, 511–512, 19 L.Ed.2d 576 (1967), could exist for a proprietor over the stock of such an enterprise. Liquor (*Colonade*) and firearms (*Biswell*) are industries of this type; when an entrepreneur embarks upon such a business, he has voluntarily chosen to subject himself to a full arsenal of governmental regulation.

Industries such as these fall within the "certain carefully defined classes of cases," referenced in *Camara*, 387 U.S., at 528, [87 S.Ct. at 1730]. The element that distinguishes these enterprises from ordinary businesses is a long tradition of close government supervision, of which any person who chooses to enter such a business must already be aware. "A central difference between those cases [*Colonnade* and *Biswell*] and this one is that

businessmen engaged in such federally licensed and regulated enterprises accept the burdens as well as the benefits of their trade, whereas the petitioner here was not engaged in any regulated or licensed business. The businessman in a regulated industry in effect consents to the restrictions placed upon him."

But last month in *Donovan v. Dewey*, —— U.S. ——, 101 S.Ct. 2534, 69 L.Ed.2d 262 (1981) the Supreme Court upheld against Fourth Amendment attack a single-industry statute authorizing warrantless administrative searches even though it did not fit into the *Colonnade-Bidwell* exceptions as reconfirmed by *Marshall v. Barlows*. *Donovan*'s language would plainly apply to the used auto parts business, where the legislative consciousness of (1) the large "industry" in stolen motor vehicles (especially facilitated by the mobility of the vehicles themselves) and (2) the major problem of the so-called "chop shops" with their ability to strip and disassemble vehicles with great speed [1] justifies specific enforcement needs tailored to the entirely legal business in used auto parts.

Accordingly the principal argument by plaintiffs—that the industry in which they are engaged is not within the limited range represented by *Colonnade* and *Biswell* —must succumb to *Donovan*. However in expanding the reach of those earlier decisions *Donovan* again made plain a requirement that had caused the OSHA provisions to be held fatally defective in *Marshall v. Barlows*. Having held the first requirement (that of defining a regulatable industry where "a warrant requirement clearly might impede the 'specific enforcement needs' of the Act") satisfied, the *Donovan* Court went on (—— U.S. at ——, 101 S.Ct. at 2540):

[T]he only real issue before us is whether the statute's inspection program, in terms of the certainty and regularity of its application, provides a constitutionally adequate substitute for a warrant. We believe that it does.

It stressed the *required* inspection of *all* mines and the specifically defined frequency of inspection. After that analysis it concluded (*id.*):

Thus, rather than leaving the frequency and purpose of inspections to the unchecked discretion of government officers, the Act establishes a predictable and guided federal regulatory presence. Like the gun dealer in *Biswell*, the operator of a mine "is not left to wonder about the purposes of the inspector or the limits of his task."

■ Measured against that standard Code § 5–401(e) is invalid. *Donovan* emphasized (id. —— U.S. at ——, 101 S.Ct. at 2539–2540) that the OSHA statute held unconstitutional in *Marshall v. Barlows* "simply provides that such searches must be performed 'at . . . reasonable times, and within reasonable limits and in a reasonable manner.'" That flawed language is echoed in Code § 5–401(e): ". . . opened . . . for inspection at any reasonable time during the night or day." Thus the Code shares the vice found fatal in *Marshall v. Barlows*, 436 U.S. at 323, 98 S.Ct. at 1825–1826 (and reaffirmed in *Donovan*, —— U.S. at ——, 101 S.Ct. at 2540):

The authority to make warrantless searches devolves almost unbridled discretion upon executive and administrative officers, particularly those in the field, as to when to search and whom to search.

Indeed we need not speculate here as to "unbridled discretion" and its exercise. Evidence during the preliminary injunction

---

1. No adverse inference is of course intended as to plaintiffs themselves. Rather the point is that the Illinois General Assembly can reasonably impose strict regulations on a legitimate industry in which the *potential* for illegal conduct is great. Thus in *Donovan* the Supreme Court referred to Congress being "plainly aware that the mining industry is among the most hazardous in the country and that the poor health and safety record of this industry has significant deleterious effects on interstate commerce," —— U.S. at ——, 101 S.Ct. at 2539, and to the Senate's reference to "the notorious ease with which many safety or health hazards may be concealed if advance warning of inspection is obtained. . . ." (*id.*)

hearing showed that searches of premises were often made by the enforcement officers *without* the predicate or even pretense that they were simply corroborative of the record-keeping requirements. Totally without warrant (both literally and figuratively), the officers conducted inventory searches extending over many hours and placed indelible markings on various of plaintiffs' auto parts. On another occasion they entered a licensee's premises in a claimed search for a law violator without a warrant and without any semblance of a showing of probable cause. It is clear that they viewed licensees as fair game, engaged in an activity that in their view was almost *malum in se* (Tr. 29: "I licensed you. I can go anywhere I want.").

True enough, administrative abuses are not a ground for invalidating the statute or regulation under which such abuses occur. However in this case they corroborate the existence and effect of the "unbridled discretion" that led the *Marshall v. Barlows* Court to conclude that a warrant was constitutionally required. Accordingly the Court concludes that the provisions of Code § 5–401(e), because they authorize administrative inspections without the need to obtain a valid search warrant, are unconstitutional despite—or perhaps because of—the Supreme Court decision in *Donovan.*[2]

It is perhaps possible to read *Donovan* in more simplistic terms, as permitting a legislature to override the Fourth Amendment merely by its determination that an industry is regulatable and has "specific enforcement needs." But such a reading would treat as unnecessary to the *Donovan* decision what the Supreme Court itself clearly found an integral part of its analysis: the

requirement of clearly defined regular enforcement procedures. Essentially the Court's approach embraces two equally necessary steps:

(1) a legislative determination as to the specific regulatory needs of an industry; and

(2) statutory establishment of inspection procedures and definition of their frequency, viewed as the functional equivalent of individualized search warrants (or as the Court put it, "a constitutionally adequate substitute for a warrant").

This is not of course to say that *advance notice* of the specific search is constitutionally required, for neither the *Donovan*-approved procedure nor a search warrant itself involves actual advance notice to the party searched of just when the search will take place.[3]

■ Plaintiffs also assert the invalidity of Rule 5–401A for vagueness and overbreadth. That position was addressed and found wanting by the Illinois Supreme Court in *Northern Illinois Automobile Wreckers.* Though Bionic is not foreclosed by that decision, the testimony and arguments it offers as to its inability to understand the requirements of the Rule are disingenuous. This Court agrees with the analysis and conclusion of the Illinois Supreme Court and joins in its rejection of the challenge on those grounds.

■ There is one related matter that merits attention and leads to a different conclusion as to part of the Rule. In an obvious drafting error the Illinois General Assembly provided in Code § 4–102(a)(4) that it is a misdemeanor violation for (emphasis added):

---

**2.** All plaintiffs other than Bionic are barred by res judicata from attacking the first sentence of Code § 5–401(e) (authorizing the warrantless inspection of records) because that provision was in the Code at the time of the *Northern Illinois Automobile Wreckers* litigation, to which each of such plaintiffs was a party or privy. However *all* the plaintiffs are free to challenge the subsequently enacted second sentence (authorizing the warrantless inspection of premises).

**3.** This decision may well represent a Pyrrhic victory for plaintiffs. Justice Stewart was plainly right in his *Donovan* dissent in concluding that it charts the route by which a legislature may supersede the Fourth Amendment on an industry-by-industry basis (—— U.S. at ——, 101 S.Ct. at 2543). Thus the Illinois General Assembly can overcome any constitutional infirmity if it simply amends the Act by following the *Donovan* road map (as amplified in this decision).

a person to buy, receive, possess, sell or dispose of a vehicle or any component part of a vehicle if the manufacturer's identification number thereon has been removed or falsified, and such person has *no knowledge* that the number is removed or falsified. . . .

Under that bizarre enactment licensees like plaintiffs are made responsible if they do *not* know of illegal conduct on the part of some third person. Such a provision is plainly unconstitutional. While it remains in the Code, however, a record-keeping requirement that would force a licensee to prove his own violation of that criminal provision would clearly pose Fifth Amendment problems. Because Rule Paragraph 1.G requires licensees to record "Whether any serial number or other identifying mark of the manufacturer or Secretary of State has been altered, defaced or removed," a statement that it has not been (though made in total good faith) would subject the licensee to criminal liability if that statement proved to be wrong *without* his knowledge. Accordingly Rule Paragraph 1.G must be held invalid.

■ In another argument addressed to the Rule plaintiffs assert its unconstitutionality because of the burdens of administration and cost imposed by the record-keeping requirements. That kind of due process claim was rejected by the Supreme Court in *California Bankers Ass'n v. Shultz*, 416 U.S. 21, 49–50, 94 S.Ct. 1494, 1511–1512, 39 L.Ed.2d 812 (1974):

> We believe. . . that there is a sufficient connection between the evil Congress sought to address and the recordkeeping procedure it required to pass muster under the Due Process Clause of the Fifth Amendment.
>
> . . . The cost burdens imposed on the banks by the recordkeeping requirements are far from unreasonable, and we hold that such burdens do not deny the banks due process of law.

This Court finds the *California Bankers Ass'n* reasoning applicable here to what is essentially a Fourteenth Amendment due process claim and therefore rejects plaintiffs' contention—certainly for preliminary injunction purposes and, absent a dramatically different showing, for final judgment purposes as well.

All the foregoing discussion must be measured against the familiar preliminary injunctive criteria, as recently repeated by our Court of Appeals in *O'Connor v. Board of Education*, 645 F.2d 578, 580 (7th Cir. 1981):

> (1) Plaintiffs have no adequate remedy at law and will be irreparably harmed if the injunction does not issue.
>
> (2) Threatened injury to plaintiffs outweighs the threatened harm the injunction may inflict on defendants.
>
> (3) Plaintiffs have at least a reasonable likelihood of success on the merits.
>
> (4) Granting a preliminary injunction will not disserve the public interest.

Irreparable harm is self-evident, but is confirmed as well by the drastic effect on plaintiff Covello and the burdens on Bionic. That threatened injury to all plaintiffs plainly outweighs the harm to defendants of non-enforcement of the unconstitutional requirements. "Reasonable likelihood of success on the merits" is clearly an understatement of plaintiffs' legal posture. And enjoining Fourth Amendment violations cannot disserve the public interest.

### Conclusion

Counsel for plaintiffs are requested to submit a proposed form of preliminary injunction order embodying the principles stated in this opinion on or before July 21, 1981. Counsel for defendants are directed to submit written comments on that proposal on or before July 31, 1981. This Court will then promptly enter its order in conformity with this opinion.