William BAIRD, Mary Moe, Gerald Zupnick, M.D., Parents' Aid Society, Inc. et al., Plaintiffs,

v.

Francis X. BELLOTTI, Attorney General, et al., Defendants.

Jane Hunerwadel et al., Defendants-Intervenors.

Civ. A. No. 74–4992–A.

United States District Court, D. Massachusetts.

Dec. 13, 1982.

Garrick Cole, Michael B. Meyer, Asst. Attys. Gen., Boston, Mass., for Atty. Gen. Com. of Mass.

Brian Riley and Mary Laura Russell, Boston, Mass., for intervenor Hunerwadel.

John H. Henn, Foley, Hoag & Eliot, Boston, Mass., for intervenor Planned Parenthood, Crittenton Hastings, Phillip G. Stubblefield.

## OPINION

BAILEY ALDRICH, Senior Circuit Judge.*

The single matter dealt with in this opinion is defendants' motion to dismiss for lateness plaintiff-intervenors' and plaintiffs' applications for attorney's fees under 42 U.S.C. § 1988, filed 8, and 30 months, respectively, after the Supreme Court had denied a petition to rehear its decision affirming this court's judgment in their favor. Counsels' services were rendered in litiga-

* Sitting by designation.

tion brought to declare unconstitutional a Massachusetts statute which required a minor to obtain parental, or judicial, consent to an abortion. Original plaintiffs were William Baird, his non-profit abortion and counseling clinic, Parents Aid Society, Inc., Mary Moe, an unmarried minor several weeks pregnant, as an alleged class representative, and Gerald Zupnick, a physician who performed abortions professionally. Prior to defendants' second, and final, appeal, to the Supreme Court, Planned Parenthood League of Massachusetts (PPLM) and certain others were permitted to intervene as parties plaintiff. Defendants were the Massachusetts Attorney General and other appropriate state officials. For convenience, original plaintiffs will be referred to as Baird, intervenors as PPLM, and all, jointly, as plaintiffs. Defendants will be referred to simply as defendant.

## I  Background

The action was commenced as a three-judge district court matter under 28 U.S.C. §§ 2281 & 2284 in October, 1974. It resulted in six published opinions, the last of which, *Bellotti v. Baird,* 1979, 443 U.S. 622, 99 S.Ct. 3035, 61 L.Ed.2d 797, was decided on July 2, with rehearing denied October 1, 1979.[1] Nothing occurred thereafter until May 29, 1980, when PPLM filed a motion for attorney's fees, together with a supporting affidavit detailing their services, a brief memorandum of law to aid in their appraisal, seven pages of abstracts of First Circuit and other circuit fee cases believed pertinent, and computer printouts detailing the individual items of work performed. These documents were sent to the deputy clerk in Springfield, Massachusetts where Judge Freedman, the district judge originally drawn, was then permanently stationed.

Defendant filed no response, probably through oversight, perhaps due to too many assistants, who, by that time, had moved on to other matters. Alternatively, it is possible he was waiting for Baird. In any event, on June 17, 1980, counsel for Baird wrote Judge Freedman the following letter.

LAW OFFICES

JOSEPH J. BALLIRO

65 EAST INDIA ROW

BOSTON, MASSACHUSETTS 02110

AREA CODE 617 227–5822

JOAN C. SCHMIDT
MARK G. MILIOTIS

June 17, 1980

John C. Stuckenbruck,
Deputy Clerk
United States District Court
436 Dwight Street
Springfield, MA 01103

Re:  William Baird, et al. v. Francis X. Bellotti, et al.

Civil Action 74–4992–F

Dear Mr. Stuckenbruck:

Kindly inform the Court that plaintiff's counsel are in the process of preparing their Motion for Attorney's Fees and Costs in above entitled matter. We anticipate filing our motion, accompanying affidavit and memorandum of law in approximately two to three weeks.

Very truly yours,
/s/ Joan C. Schmidt
Joan C. Schmidt

JCS/dpi
cc:  Gerrick F. Cole, Esq.
    Assistant Attorney General
    One Ashburton Place
    Boston, MA 02108
    Brian A. Riley, Esq.
    40 Court Street
    Boston, MA 02108

---

1. The earlier five were *Baird v. Bellotti,* D.Mass., 1975, 393 F.Supp. 847; *Bellotti v. Baird,* 1976, 428 U.S. 132, 96 S.Ct. 2857, 49 L.Ed.2d 844; *Baird v. Bellotti,* D.Mass., 1977, 428 F.Supp. 854; *Baird v. Attorney General,* 1977, 371 Mass. 741, 360 N.E.2d 288; and *Baird v. Bellotti,* D.Mass., 1978, 450 F.Supp. 997. Ex-

cept for a temporary set-back due to a new-found desire by the Attorney General for abstention, coupled with representations by him about the Massachusetts statute—which proved incorrect—plaintiffs were uniformly successful.

John H. Henn, Esq.
Foley Hiag & Elliot
10 Post Office Square
Boston, MA 02109

This undertaking was not complied with. Nothing further occurred until April 12, 1982, when counsel for PPLM wrote Judge Freedman requesting that its motion be heard, stating that he had not made the request earlier because of the Pendency of *White v. New Hampshire Department of Employment Security,* post, now decided. Three days later counsel for Baird served in hand, and on April 20, filed a motion for attorney's fees supported by extensive affidavits and memorandum of law.

■ At this point Judge Freedman requested the writer of this opinion to substitute for him as principal district judge. This request was accepted. The court now rules that all matters following the Supreme Court's second decision are single judge matters, and, accordingly, proceeds alone to decide the motion to dismiss. *See Rosado v. Wyman,* 1970, 397 U.S. 397, 400, 90 S.Ct. 1207, 1211, 25 L.Ed.2d 442; *Public Service Commission v. Brashear Freight Lines, Inc.,* 1941, 312 U.S. 621, 625, 61 S.Ct. 784, 786, 85 L.Ed. 1083; *Mader v. Crowell,* M.D.Tenn., 1981, 506 F.Supp. 484, 485–86.

## II  Motion to Dismiss

On April 29, 1982, defendant filed a notice of opposition to Baird's motion and a motion to dismiss PPLM's motion. By an amplified consolidated motion, filed on May 20, defendant moved to dismiss all motions, giving the following reasons.

"1.  Plaintiffs' application for attorney's fees, which was filed almost four years after this Court's final judgment in this case, is untimely or, alternatively, barred by laches.

"2.  Plaintiff-intervenors' application for attorney's fees, which was filed almost one year after the final decision of the United States Supreme Court and supplemented almost three years after that decision is untimely or, alternatively, barred by laches.

"3.  Plaintiff-intervenors' application for attorney's fees should be dismissed for lack of prosecution, since plaintiff-intervenors took no action on that motion for almost two years after it was filed."

### A.  Lack of Prosecution

■ PPLM's counsel has filed an affidavit, which the court accepts, stating that counsel was initially reluctant to press the court in the summer of 1980 with a motion which presented substantial material. By the same token, the court notes that since the court and the several lawyers are unlikely to synchronize their summer vacations, by waiting until May 29, 1980, PPLM was almost necessarily precluding a hearing, and perhaps any other meaningful activity, until fall, thereby approaching a full year even from the denial of rehearing. Meanwhile, on August 12, 1980, the Court of Appeals decided the case of *White v. New Hampshire Department of Employment Security,* 1 Cir., 1980, 629 F.2d 697 (*White* I), holding that attorney's fees must be applied for within 10 days of final judgment, pursuant to F.R.Civ.P. 59(e). While pondering this imposing obstacle PPLM's counsel stated he learned that certiorari had been applied for, and, later, granted, and so concluded to wait. Six weeks after the Court reversed the Court of Appeals, *White v. New Hampshire Department of Employment Security,* 455 U.S. 445, 102 S.Ct. 1162, 71 L.Ed.2d 325 (1982) (*White* II), PPLM requested that its application be heard.

The court finds PPLM's delay in marking, as distinguished from filing, reasonable under the circumstances. Likewise, the court does not charge defendant with failure to file his motion to dismiss sooner. PPLM has suffered no prejudice, and defendant's motion was prompt as to Baird.

### B.  Timeliness

With respect to defendant's claims that plaintiffs' applications were "untimely or, alternatively, barred by laches," there is no issue of timeliness in the strict calendar sense, the Court having ruled in *White* II that there was no applicable rule with a

time provision. The Court did not decide whether the matter came under F.R.Civ.P. 54(d) and 58, which set no time, or under no rule at all and was purely equitable. In either event, however, there are serious questions of timeliness in the broader sense.

In *White,* plaintiff's counsel, five days after a consent judgment, raised the matter of fees with defendant's counsel, and sought, unsuccessfully, to confer on the amount. Four and a half months later White filed his application. Defendant responded that the issue was disposed of by the consent decree. The court ruled otherwise, and proceeded to award a fee. Defendant appealed, claiming, inter alia, that the fee application was untimely in light of Rule 59(e). The Court of Appeals agreed, *White* I, but was reversed by *White* II, the Court remanding the case for further consideration.

In *White* II the Court, describing a fee award as costs in the sense of available only if the party prevails, but "collateral" and "separable" and not within Rule 59(e) and its ten day requirement, stated that the inquiry should be whether delay "unfairly surprises or prejudices the affected party." It added that negotiation before filing is desirable, but that there are advantages to promptness, and a local rule, such as 21 days from final judgment, could be appropriate. It found it unnecessary to decide whether fees are costs under Rule 54(d) and 58, but noted that, in any event, the district court has discretion to deny motions filed with "unreasonable tardiness."

On remand, *White v. New Hampshire Department of Employment Security,* 1 Cir., 1982, 679 F.2d 283 (*White* III), the court analyzed the district court's decision and concluded that it had in effect found that there had been no unfair surprise or prejudice. It did not, however, stop there, but considered whether the court's decision was reasonable.

"[T]here was no applicable local rule in force. In its absence, the determination of timeliness rested within the sound discretion of the district court. The delay here—approximately four and one-half months after the entry of the consent decree—was considerable, but it was not so extreme, given all the other circumstances of this case, as to necessitate a finding that the request was untimely, and the district court did not make one. *See* 629 F.2d at 701. Although well aware of the time involved, the district court plainly did not consider the motion as having been delayed unreasonably. Finding no abuse of discretion with this determination, we proceed to NHDES's other challenges to the award." *White* III, at 285.

Of particular significance is the phrase, "not so extreme, given all the other circumstances." There were two; that fees were discussed prior to the entry of judgment, and that plaintiff's demand was brought to defendant's attention five days after judgment was entered. If, even with special circumstances, four and a half months is "considerable," how much more are the delays here, if there were none. In this last, the plaintiffs may not stand alike.

#### (a) *Baird's Claim.*

As previously noted, Balliro and Schmidt closely followed PPLM's filing with their June 17 letter stating that Baird would file shortly. Since section 1988 makes the party, not individual counsel, the one entitled, this letter must be taken as speaking also for the services of former counsel, Roy Lucas, of Washington, D.C.[2] Although the court pointed to this undertaking at the hearing on the present motion, it has never been informed why it was not carried out.[3] Balliro and Schmidt executed affidavits,

---

**2.** Balliro replaced Lucas in April, 1977, just prior to the hearing in this court that led to the ruling in plaintiffs' favor affirmed by the second Supreme Court decision.

**3.** Baird was the only one who requested an oral hearing. Immediately before the assigned date,

he withdrew the request. The court concluded to hold the hearing nevertheless, and counsel appeared and argued. Thereafter the court inquired of all counsel whether they had done any substantial other work not entered in their diaries. Nothing was vouchsafed by Baird.

containing their diary entries, on August 11, 1980,[4] but failed to file them until April 20, 1982, when Lucas filed his. Accompanying the affidavits was an extensive memorandum, signed by all three attorneys, but manifestly prepared by Lucas. All three Baird attorneys also signed the memorandum opposing the motion to dismiss, although, again, it appears to have been written by Lucas. What is stated hereafter is taken therefrom.

Baird, unlike PPLM, post, makes no claim that the delay in filing his motion for fees was due to counsels' other preoccupations; rather, it was due to the state of the law. After saying he did not become a prevailing party until October 25, 1979, Baird says,

> "The principal guide at that time came from the Supreme Court decision of *Sprague v. Ticonic National Bank,* 307 U.S. 161 [59 S.Ct. 777, 83 L.Ed. 1184] (1939)."

*Sprague* is, indeed, a guide in one respect. Defendant, quite unaccountably, argues the desirability of filing for attorney's fees immediately after the district court's judgment on the merits, so that any appeal from the court's action may be consolidated with the substantive appeal. *Sprague* may well be taken as opposed to that view—as is this court, in the present case.[5] However, it in no way suggests delay after the initial judgment had become final, the basic issue at bar. In *Sprague* the fee application was filed two months *before* the Supreme Court's affirmance of the judgment. *See* 307 U.S., at 163, 59 S.Ct. at 778. *See, also,* the decision below, cited by the Court, *Sprague v. Picher,* D.Me., 1938, 23 F.Supp. 59.

Next, Baird says that in October, 1979 there were questions of law pending before the Supreme Court which, if decided against him, could make his pursuit of fees fruitless.

"In addition [to *Sprague*], several important and potentially illuminating cases were already before the Supreme Court.

"On October 1, 1979, the Court granted certiorari in *Maher v. Gagne [Gagne v. Maher],* 594 F.2d 336 (2d Cir.1979). 444 U.S. 824 [100 S.Ct. 44, 62 L.Ed.2d 30]. The next week the Court agreed to hear . . . .

"These five cases, individually and collectively, had overwhelming significance for the *Baird* fee issue. Adverse rulings on some issues could have eliminated the claim entirely. Favorable decisions and a strong reinforcement of Congressional purpose could strengthen and simplify the Baird disposition.

"By waiting, plaintiff's counsel were conserving the time of this Court, not violating any local rules, and exercising reasonable legal judgment. It would have been precipitous, if not irresponsible, to charge ahead, inviting unnecessary disputes, appeals, and a waste of judicial time."

A review of these cases, as confirmed by the ultimate decisions, discloses no guidance that could have been expected, with the most minor exceptions. It is to be borne in mind that the Court had already held, in *Hutto v. Finney,* 1978, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522, that the Eleventh Amendment was no bar to an award of counsel fees. The issues in Baird's five cases did not threaten this holding, and in no way indicated that it would be "precipitous, if not irresponsible, to charge ahead" and file for fees. Rather, to have been deterred by their "potentiality" would seem a counsel of catatonic arrest.[6]

4. Balliro's affidavit terminates,

| | | |
|---|---|---|
| July 2, 1979 | Review of opinion from U.S. Supreme Court, conference with clients. | 2.0 [hrs.] |

Schmidt's terminates,

| | | |
|---|---|---|
| July 2, 1979 | Review of opinion from U.S. Supreme Court; conference with Mr. Balliro and clients. | 2.0 [hrs.] |
| July 1, 1980 through August 1, 1980 | Preparation of bill | 15.0 [hrs.] |

5. Defendant's contrary argument is premised on the assertion that this court's 1975 decision was a "final judgment." Of course it was not.

6. *Gagne v. Maher,* 2 Cir., 1979, 594 F.2d 336, aff'd 448 U.S. 122, 100 S.Ct. 2570, 65 L.Ed.2d 653, involved plaintiffs' right to fees incurred in the fee proceeding itself—already decided in favor of plaintiff in *Lund v. Affleck,* 1 Cir., 1978, 587 F.2d 75, 77. A decision here would be ultimately relevant, but not to the motion itself. *Carey v. New York Gaslight Club, Inc.,*

Nor does it appear that these cases in fact motivated Baird at the time. There are no diary entries in October, 1979; the first entry with respect to Baird's seeking fees is on March 6, 1980. "Confer w/client & co-counsel in Boston on possibility of § 1988 fee recovery in light of pending cases & recent legal research. (RL) 2.0" The next is "3/80 Legal research by paralegal CI on CA 1 fee cases & others relevant to a Baird counsel claim. (CI) 16.5." If it be thought that counsel had general knowledge of the five October cases and was awaiting their resolution to avoid wasting time, nothing had occurred in March. It is true that they received mention on 6/26/80, after the end of term,

"Study impact of *N.Y.Gaslight* (6/9), *Va. Consumers* (6/2), *Maher v. Gagne* (6/25), *Thiboutot* (6/25), and *Mahoning* (6/16), on possibility of fees in case. (RL) *4.0*"

but, in view of Lucas' thoroughness in spending over 200 hours on the fee issue, the court attaches no special significance to this. If, in fact, he was delaying for their decision, action should have then ensued. It did not; the next entry was August 12. "Review fee matter, confer w/JH re: research. (RL) .25"

It was also on August 12 that *White* I was decided. One may doubt, however, that non-parties had instantaneous notification thereof. The first reference to be found in any diary entry,—"Research *New Hampshire* case"—comes a month later. Moreover, we note this singular situation. If the pending October cases justified delay in preparing the fee application because "almost any result ... would preempt the legal research work product of October 1979 through June 1980 to some extent," *White*'s ruling that it was already too late, which did not stand alone in the circuits and might well be affirmed, would seem to have been far more threatening than they. Yet, although "ever" concerned that "hundreds of necessary hours would be wasted," in the time between study of the *New Hampshire* case and the advent of *White* II, the Lucas office spent almost one half of its entire fee preparation time. To answer this seeming inconsistency by writing off that activity as "some minimal work"[7] is shocking. On this total record the court gives no greater weight to the assertion that the state of the law in October, 1979 was Baird's reason for not proceeding at that time. The reason was simply personal choice, now tarted up.

(b) *PPLM's Claim.*

PPLM did not rely on the state of the law, and filed on May 29, incidentally before any of the October, 1979 cases had been decided. Its excuse was that counsel was otherwise occupied.[8] A good deal of documentation would be needed for so long a period, and none was offered. Nor does the court accept PPLM's assertion, "As a delay of four and a half months in *White* was acceptable ..., [t]he extra two and a half months is insignificant ...." This is a method of arguing that knows no limits. Moreover, although seven months from receipt of mandate on October 25, where PPLM's proffered excuse for delay is other demands on counsel there could have been no doubts after October 1, the date of the denial of the petition. It is inconceivable

2 Cir., 1979, 598 F.2d 1253, *aff'd*, 447 U.S. 54, 100 S.Ct. 2024, 64 L.Ed.2d 723, could, perhaps, have been cited in defeating defendant's contention that fees were not recoverable in connection with the certification proceeding in the Massachusetts court held at the Supreme Court's direction, a claim we could only label preposterous to begin with. The issues in the other three cases, *Consumers Union of the United States, Inc. v. American Bar Association*, E.D.Va., 1979, 470 F.Supp. 1055, *vacated and remanded, sub nom. Supreme Court v. Consumers Union of the United States, Inc.*, 446 U.S. 719, 100 S.Ct. 1967, 64 L.Ed.2d 641;

*Thiboutot v. Maine*, Me., 1979, 405 A.2d 230, *aff'd* 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555; and *Mahoning Women's Center v. Hunter*, 6 Cir., 1979, 610 F.2d 456, *vacated and remanded*, 447 U.S. 918, 100 S.Ct. 3006, 65 L.Ed.2d 1110, are not even remotely related.

7. "Plaintiffs' counsel continued some minimal work through associates in the hope that *White* would not stand." Baird Memorandum, at 4.

8. It also spoke of a computer printout problem, but we cannot think of this in terms of months.

that there could have been a second. Indeed, where the Court had decided 8 to 1, one might ask what doubts could have been occasioned by the first. PPLM's seven months had one month's certain advance notification, and three more, close to certain. Quite apart from White's special circumstances, this is far different from White's four and a half months.

### (c) Timeliness—Conclusion.

The court does not consider there to have been need for PPLM to consume seven months in any event. It could have required little legal skill to tabulate book charges, and there was nothing about its affidavit and short memorandum and assembly of cases that required particular expert specialization. Abstracting cases on attorney's fees would seem a pedestrian undertaking.[9]

Baird filed much more than this, a memorandum fifty pages long, in addition to eight pages of abstracts. However, if a party wishes to do a job in spades (Lucas spent 215 hours on his fees, as distinguished from 185 hours on the first Supreme Court appeal) this should not be at the expense in terms of time—or dollars—of the party on whom the burden falls.

The court agrees that plaintiffs were not obliged to borrow a leaf from *Sprague*'s book and file prior to the denial of the petition for rehearing. However, particularly with lead time to indicate probabilities of being able to file, it sees no reason for more than a sixty day delay thereafter. This appears to be normal practice in other fee cases. *See, e.g., Johnson v. Snyder,* 6 Cir., 1981, 639 F.2d 316 (per curiam); *Jones v. Dealers Tractor & Equipment Co.,* 5 Cir., 1981, 634 F.2d 180, 181 (per curiam). *But see Gary v. Spires,* 4 Cir., 1980, 634 F.2d 772. Even if the two months were to be doubled, PPLM fell well short. Baird was not even in sight.

9. The court does not know how much time was, in fact, spent on this matter, PPLM's counsel stating that he charged "extensive research" to another case. Although attorney's fees as costs are collected in U.S.Code Annotated and in West Digest, the court will assume that, in hours, this could be considerable. On

### C. Prejudice

### (a) The Length of the Delay

Particularly where a claim of prejudice is based upon delay simpliciter, there must be two inquiries, how long was the delay, and what was its effect? The starting point, when there comes to be "unreasonable tardiness" (*White* II n. 17), has already been considered. There are questions as to the other end. With respect to Baird defendant claims the full period to April 20, 1982, namely, some two and a half years. Baird says the interval between *White* I and *White* II should be deducted. The court disagrees. In the first place, Baird was nowhere near ready to proceed on August 12; there is nothing to indicate that he would have filed for months. Moreover, there is a deeper principle. The concept of laches is that a party is to be forgiven his unreasonable delay, provided it has had no prejudicial consequences. If there are such, it is irrelevant how they occurred, or whether it was his fault. If a vital witness dies, that is plaintiff's misfortune; if he remains fresh and available, that is plaintiff's good fortune. The test of prejudice vel non is simple and objective, was defendant hurt as a result of the delay?

Because of Baird's non-filing, and the arrival of *White* I, all proceedings obviously came to a halt, as a direct consequence. Baird is not to be credited, but to be debited for this delay, to the extent that it hurt, and defendant's prejudice must be measured by the entire interval.

PPLM is in the same difficulty. If a defendant's witness had died a week after a late suit was filed, and before it could possibly have been tried, (or, conceivably, before his deposition could have been taken, a remedy not available here), the loss should be

this single, straightforward subject, however, it does not assume that it required a matter of weeks, occupying fall and winter. So far as legal work directed to this case is concerned, it did not begin until April 10, 1980, and required, to May 29, the date of filing, 18 hours.

just as much a consequence of the late filing as if the witness had died the week preceding. *White* I's appearance interrupted the present proceedings just as much as if it had occurred three months earlier. The court could hardly be expected to have a hearing between June 1 and August 12; PPLM's counsel suggested as much in stating why he did not request a summer hearing. Accordingly, *White* I's interruption was a direct consequence of PPLM's late filing, and PPLM must be charged therewith. In sum, neither plaintiff was rescued by *White* I; rather, they were further submerged.

Concededly this was hard lines. However, where their fault was established, the only question was the practical result, which was that the court was not presented with an opportunity for a hearing until two and a half years had elapsed from the clerk's office's receipt of mandate.

This conclusion may be tested by approaching from the other direction. If application had been made promptly in the fall or early winter, it could have been disposed of well before *White* I's arrival. Baird has suggested that possibly this might not have occurred. However, the party at fault is not the one to engage in speculations.

### (b) *The Effect of the Delay*

When delaying a matter that, although separate, is collateral to, and closely connected with, judicial proceedings that have otherwise terminated, prejudice should arise quickly. The advantages of a continuum, and the loss from interruption, differ from laches in the bringing of a cause of action. In *White* II the Court spoke favorably of a 21 day rule, a recognition of the desirability of promptness. This benefits everyone—except possibly plaintiffs. The financially responsible party has a natural interest in clearing up its docket and getting things behind it. So has the court. While the *White* Court did not speak of the court as an affected party, it manifestly is. The question did not arise in *White* because the district court there had made an award,

and had indicated no objection to delay. A court may well be affected, however, both for itself and on behalf of the defendant.

A Massachusetts plaintiff seeking fees presently comes into court with diaries and records and asserts a "lodestar" figure. *Furtado v. Bishop,* 1 Cir., 1980, 635 F.2d 915. Wherever may be the burden of proof, the burden of going forward with the second step, viz., establishing excessiveness, or countervailing, or negative aspects, would normally seem to be on the defendant. The court has been held obligated to state reasons for a departure, a view already current in October, 1979. *See Gagne v. Maher,* 2 Cir., 1979, 594 F.2d 336, 345, *aff'd* 448 U.S. 122, 100 S.Ct. 2570, 65 L.Ed.2d 653, and cases cited. While, in October, 1979 the First Circuit had not yet adopted the "lodestar" approach, plaintiffs were on notice that the court called for very specific analysis and findings. *Furtado v. Bishop,* 1 Cir., 7/26/79, 604 F.2d 80, 98, *cert. denied,* 444 U.S. 1035, 100 S.Ct. 710, 62 L.Ed.2d 672, a case reversing the present writer for failure to do so. Either method imposes a heavy factual burden on someone, which can only increase with the passage of time.

Baird would meet this last conclusion by inquiring, with respect to defendant's right to be heard, whether assistant attorneys general suffer from "amnesia." His proffered reply to defendant's pointing out that there is a normal turnover in the Attorney General's office and that, during the delay, his last knowledgeable assistant had, indeed, left, very possibly diminishing the interest, and perhaps availability, of departed employees with respect to affording sufficient time for reviewing files and refreshing recollections, is that if departures could be recognized, "there would be massive layoffs each time a major case was lost." Filing his application nearly three years after the Court's final opinion, five years after Lucas had performed any services, the court would not think him in a position to adopt this style of argument. Nor is defendant's point ill-taken. Courts have found prejudice simply in the fact that employees have

left their employment. *Goodman v. McDonnell Douglas Corp.,* 8 Cir., 1979, 606 F.2d 800, 808 ("retired, transferred [or] quit"), *cert. denied,* 446 U.S. 913, 100 S.Ct. 1844, 64 L.Ed.2d 267; *Boone v. Mechanical Specialties Co.,* 9 Cir., 1979, 609 F.2d 956, 959 ("retirements, voluntary and involuntary terminations").

Baird then engages in a switch.

"Nor is the testimony of prior assistants necessarily relevant. Their tasks as defendant-appellants for the most part were different. It is the Court's duty, in the long run, to decide what work was reasonable and what fees are just. No overriding issue in this fee matter turns upon the recollection of past assistant attorneys general. One does not write a history of an event from the recollection of those who departed the scene and left their records and/or memories behind."

Apparently the departed assistants are good riddance.

While the court regards a defendant's right of participation in argument, and possibly testimony and cross-examination, as important, it accepts Baird's assertion that itself is perhaps the most important factor. A judge's qualifications to determine appropriate and reasonable counsel fees come in large measure from his closeness to, and familiarity with, the case. While this relates particularly to proceedings that took place before him, it also applies to subsequent proceedings originating therefrom. At the same time, a judge, who must constantly move from one case to another, can forget. It requires additional effort and time to recall the past. Unnecessary taking of the court's time is an imposition on other litigants. In this connection the Court of Appeals has recently held that "inconvenience . . . to the court [and] to other litigants" may be a reason for not permitting even a short reopening of a trial. *Blaikie v. Callahan,* 1 Cir., 1982, 691 F.2d 64, 67. *See, also,* discussion and cases cited in *Affanato*

*v. Merrill Brothers,* 1 Cir., 1977, 547 F.2d 138, 140. While the court recognized in *Affanato* that the outright loss of rights was a serious matter, as does this court, it is to be recalled that the right to counsel fees is tempered by the court's discretion. It is a familiar principle that he who seeks equity should do equity. Nevertheless, while the court feels that prejudice to parties other than defendant should be encompassed in this overall question and charged against plaintiffs, for the purposes of its actual resolution of prejudice vel non it will consider only prejudice to the defendant. If a court above would also consider prejudice to the court and to other litigants, the court feels that such would result here if plaintiffs' lateness were to be overlooked.

Not only can the court forget temporarily, it may well not be possible to refresh its recollection completely. This disability may substantially affect the defendant. If the court fails to remember events or circumstances rebutting or diminishing any of plaintiffs' claims, which they assert to be prima facie until discounted, it will be at defendant's cost.[10] It seems more than possible that testimony may have to be taken; certainly more than generalized argument will be in order. The passage of time may well dull the memory even of plaintiffs' various counsel as to why certain of their activity, or the extent thereof, was deemed necessary. This, too, under the circumstances, is more likely to redound to defendant's loss than to plaintiffs'.

So far the court has been looking at the situation from the standpoint of the defendant, and of the court in the broad sense. It should ask itself, in turn, whether, in remedying unfairness to defendant by denying fee claims, it is being unfair to plaintiffs. Plaintiffs can say that in October 1979 the fee statute was only three years old and there had been no cases telling them they should proceed other than at their own

---

10. As an important example, the court's memory could grow dim, as it now has, with respect to the basis of its "reservations about the ade-

quacy of plaintiffs' [viz., Baird's] representation." *See Baird v. Bellotti,* 450 F.Supp., at 999 n. 3.

pace.[11] On the other hand, there was no case telling them they could do so. The very fact that the statute describes attorney's fees as costs indicates an obvious attachment to the principal cause of action. Most important, their equitable nature is made clear by the fact that the fee award is discretionary. The reasons for promptness here advanced were not dredged from recess of imagination. Rather, as a matter of fairness, they would seem as self-evident in 1979 as now. Even today plaintiffs', and the court's, research has been unable to find cases considering the question more favorable to them than *White* III.[12]

## III Conclusion

■ The delay with respect to Baird is particularly serious, even if it were 'to be assumed that *White* I had never been decided and Baird's filing date be taken, on the basis previously discussed, as the fall of 1980. A great length of time had already passed as to some of the services—all that were rendered by Lucas—and delay may have a crescendo effect. Also, there were many services, and they were diverse. On any basis, *White* or no *White*, the court would find a strong probability of prejudice.

PPLM's filing was very much prompter, though even here, for reasons previously noted, there would seem little practical difference between May 29, and a filing the following fall. PPLM has further differ-

ences. Not only were the services relatively more recent, but they were confined to resisting defendant's second appeal, viz., a motion and brief to affirm, a principal brief, obtaining leave to argue orally, and appellate argument, and were thus of a type simpler, and more easily appraisable, than Baird's totality. However, PPLM has presented the court with a serious problem. These services consumed a total of 880 hours, for which is requested $65,000, plus a 50% multiplier. This number of hours for such activity, even for a single appellee,[13] is entirely foreign to the court's experience. It would seem especially large with respect to a case that had already been extensively briefed, and as to which, with due modesty, there had been a considered opinion. Moreover, PPLM was an appellee in a relatively comfortable position.[14] "The [Massachusetts] court did not ... read into the statute the exceptions the Supreme Court had indicated would make a fundamental difference and might save it from constitutional infirmity." *Baird v. Bellotti*, 450 F.Supp., at 1005. In common parlance, the pitcher was well ahead of the batter.

Unusual scrutiny is called for in these circumstances, giving the passage of time particular significance. Counsel's affidavit makes apparent that one of the issues would be that of unnecessary duplication within his own office, a proper inquiry. *See, e.g., Copeland v. Marshall*, D.C.Cir.,

---

**11.** *White* I already had 'a predecessor invoking Rule 59(e). *Hirschkop v. Snead*, E.D.Va., (8/2/79), 475 F.Supp. 59, *aff'd*, 646 F.2d 149.

**12.** The "over four month" delay in *Brown v. City of Palmetto*, 11 Cir., 1982, 681 F.2d 1325, is certainly no more favorable than *White* III. *Bond v. Stanton*, 7 Cir., 1980, 630 F.2d 1231, *cert. denied sub nom. Blinzinger v. Bond*, 454 U.S. 1063, 102 S.Ct. 614, 70 L.Ed.2d 601, and *Doulin v. White*, E.D.Ark., 1982, 549 F.Supp. 152, are distinguishable since in both post-judgment fee settlement negotiations had occurred. This court is aware of Judge Freedman's decision in *Brewster v. Dukakis*, D.Mass., 1982, 544 F.Supp. 1069, where the court allowed a fee application filed two years late. However, the court found no significant prejudice, noting that the parties had continued a close negotiating and monitoring relationship since judgment based on a consent decree. Since the case

involved complex litigation relating to hospital services and the award was deemed interim to continuing jurisdiction by the court over the parties for purposes of enforcement, the case is distinguishable on the facts. To the extent that it is not, this court declines to follow it.

**13.** Whether a defendant must bear full double charges when the court has permitted intervention by a party whose interests correspond with original plaintiffs, who remain in the case, would present a question. However, the court does not consider that question substantially affected by delay.

**14.** Candor requires noting that error in one, relatively minor, aspect of our opinion did occasion it difficulty. *See Bellotti v. Baird*, 443 U.S., at 644 n. 24, 99 S.Ct., at 3049 n. 24.

1980, 641 F.2d 880, 891. There are 118 entries labelled "conference," apparently mostly interoffice, and 48 for "telephone," many, seemingly, additional interoffice conferences. The affidavit lists four individuals who spent eighty or more hours apiece. This is in no way criticism of the quality of the product. The court requested, and has examined, PPLM's brief, and finds it excellent. However, it could be asked how much of it is more than a restatement—no doubt better phrased—of our prior opinions, 450 F.Supp. 998–1006; 393 F.Supp. 849–57. Perfection is not possible, and, at some point, fairness and diminishing returns dictate that charges be not further run up against an opponent. That point may well have been passed, but, more important, with the passage of time it will be more difficult to determine when it did.

The court returns to the practical problems of measuring what is a reasonable fee. One need only turn to the careful examination called for by the lodestar rule as illustrated by *Furtado v. Bishop,* 635 F.2d, at 920–23, to appreciate the mounting difficulties of tardily recapturing and measuring services represented by 200 diary entries in addition to 166 for conferences and telephones, involving some seven attorneys. Even if successful, having in mind that the charged party must bear the costs, merely to require a longer hearing would constitute prejudice. Furthermore, the uncertainties of success, or even, perhaps, of knowing whether success has been fully achieved, are part of the problem. Even disregarding *White* I's delay, the court sees more difficulties in all respects on the basis of PPLM's May 29, 1980 filing than would have been the case had the filing been the preceding fall, and feels so a fortiori if *White*'s postponement is to be taken into account.

It is true, as PPLM says, that under the lodestar rule the initial burden is upon it to show the amount of time reasonably spent, as well as the appropriate rates. However,

its suggestion, "Insofar as PPLM does have difficulties in proving some item in its fee claim—*e.g.,* an unexplained 'conference'— the proper remedy is to disregard *the particular time* attributed to that item, not to dismiss the entire claim," (ital. in orig.) is altogether too facile. This might apply to minor items, but where its diary entries show, generally, what was done and the time spent, a court would seem more likely to start with an assumption of reasonableness than to disregard altogether. The concept that delay is to the defendant's benefit would stand the principle of laches on its head. When the court in *White* III spoke of four and a half months as "not so extreme, given all the other circumstances ·... as to necessitate a finding that the request was untimely," clearly it was contemplating the likelihood of prejudice to the defendant, not to the plaintiff. The court here envisages no net benefit to the defendant.

This was a meritorious case, requiring, altogether, much work. The loss to plaintiffs, or their counsel,[15] is obviously very considerable. However, where a substantial delay has occurred, questions of fairness should be resolved against the parties that had the sole control. The court has pondered this matter deeply, but finds there is a probability of substantial prejudice, and concludes that the application of all plaintiffs for attorney's fees should be dismissed.

■ The only question that remains is one that was not argued, whether this advance finding can be sufficient, or whether the court must conduct a necessarily elaborate fee hearing, and then determine whether, in fact, there was prejudice. The court answers this question by saying that a party guilty of an unexcused substantial delay should not be entitled to impose that great burden, and in this instance the court invokes the burden on itself and other litigants as well as that on the defendant.

This opinion does not cover other costs and expenses, which are left open.

---

**15.** All counsel have stated that their clients cannot afford to pay fees. This cannot increase defendant's obligation. Nor, since counsel were the ones who occasioned the delay, should it change the equities.